**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN M. BILLY, | : | CIVIL ACTION NO. **1:11-CV-01577** |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| OFFICER DANIEL L. PEIPER, | : | |
| *et. al*, | : | (Magistrate Judge Schwab) |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I.     Introduction.

The plaintiff, Stephen Billy ("Billy"), a pre-trial detainee, brings this civil

rights action under 42 U.S.C. § 1983 for alleged constitutional violations in

connection with his 2009 arrest in Harrisburg, Pennsylvania.  Before the Court is

the defendants' motion to disqualify Billy's counsel, Devon Jacob ("Jacob") and

the Law Firm of Boyle, Autry & Murphy (the "Boyle Firm"), for a perceived

conflict of interest in violation of Rule 1.9(a) of the Pennsylvania Rules of

Professional Conduct ("Pa. Rules Prof'l Conduct").  For the reasons set forth

herein, we recommend that the defendants' motion be granted.

## II. **Background**.

### A. Billy's Amended Complaint.

On August 23, 2011, Billy filed suit under 42 U.S.C. § 1983 against Daniel

L. Peiper ("Peiper"), a police officer for the Harrisburg Police Bureau ("HPB"), for

excessive force in violation of the Fourth Amendment. *Doc.* 1. On January 18,

2012, Jacob entered an appearance on Billy's behalf. *Doc.* 11. Thereafter, on June

6, 2012, after seeking leave of Court, Jacob drafted and filed Billy's amended

complaint.[1] *Doc.* 28.

In the amended complaint, six defendants were added: (1) Raymond R. Lyda

("Lyda"), an HBP police officer with the rank of Corporal; (2) Michael E. Maurer

("Maurer"), an HPB police officer; (3) Robert L. Yost ("Yost"), an HBP police

officer; (4) Kelly R. Wetzel ("Wetzel"), an HBP police officer with the rank of

Sergeant; (5) Clifford A. Karlsen ("Karlsen"), an HBP police officer with the rank

of Sergeant; and (6) the City of Harrisburg ("Harrisburg") as a defendant. *Doc.* 28

at ¶¶ 5-11. As well, Billy raised the following claims: (1) Fourth Amendment use

of excessive force against Lyda, Maurer, Peiper, Yost, and Wetzel; (2) Fourteenth

Amendment denial of medical care against Lyda, Maruer, Peiper, Yost, and

Wetzel; (3) Fourth and Fourteenth Amendment supervisor liability against Lyda,

---

[1] Billy, through Jacob, attempted to file a second amended complaint (*see Doc.* 33), but the Court ordered that it be stricken from the record for failing to seek the defendants' written consent or leave of Court. *Doc.* 46.

Wetzel, and Karlsen; and (4) municipal liability claims in accord with *Monell*[2].

*Doc.* 28.  Moreover, the amended complaint specifically alleges:

> 66. [Billy] expects that discovery will reveal that the defendant officers had been involved in incidents involving (1) complaints of the use of excessive force, (2) the actual use of excessive force, or (3) litigation regarding force used, and [Harrisburg] did not (1) retrain the officers on the proper use of force, or (2) psychologically evaluate or treat the officers.
>
> 67. [Billy] expects that discovery will reveal that [Harrisburg] did not train supervising officers on how to (1) supervise subordinate officers, (2) implement department policies, (3) monitor officers to ensure that department policies are followed, and (4) review incident reports for the purpose of discovering inconsistencies in reports and to ensure that incidents are properly documented.
>
> 68. [Billy] expects that discovery will reveal that [Harrisburg] did not follow its internal affairs policy and investigate and discipline the defendants for the conduct discussed in the amended complaint.

*Doc.* 28 at ¶¶ 66-68.

The following facts give rise to Billy's claims for relief.[3]  On December 19, 2009, at approximately 1:30 a.m., Billy and three other individuals were placed in handcuffs and detained by Lyda, Maurer, Peiper and Yost in Harrisburg,

---

[2]     *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

[3]     These facts are provided solely for background purposes.  We pass no judgment on their veracity.

3

Pennsylvania.[4]  *Id.* at ¶¶ 14, 15.  Billy claims that he did not understand why he was being detained and, therefore, he became upset.  *Id.* at ¶ 16.  Consequently, Billy refused to be quiet when ordered to do so and proceeded to argue with the defendant officers.  *Id.*

According to Billy, Maurer screamed at him and repeatedly told him to "shut up" while pointing angrily at Billy's face.  *Id.* at ¶ 17.  Billy admits that he still did not quiet down, which resulted in Maurer poking him in the eye.  *Id.* at ¶ 18.  Billy further claims that when he asked Maurer to stop poking him in the eye, Maurer did it again several more times.  *Id.* at ¶ 19.

At some point after Maurer poked Billy in the eye, Lyda allegedly grabbed Billy by the back of the shirt, walked him over to a patrol vehicle, and slammed him into the vehicle's hood.  *Id.* at ¶ 20.  According to Billy, defendants Wetzel, Peiper, and Yost were also present, but that they did not intervene.  *See id.* at ¶ 21.  Billy alleges that he suffered a broken tooth, bruised ribs, and a compressed fracture on his spine.  *Id.* at ¶ 24.  Due to the injury to his teeth, Billy claims that he received a prefab post- and core- crown in addition to a permanent crown.  *Id.* at ¶ 25.  The defendants, Billy further alleges, waited until approximately 5:00 a.m.

---

[4]     Billy does not explain why he and the other individuals were arrested.  He does allege, however, that an incident report indicates that he had been drinking, but was not intoxicated or fighting.  *Doc.* 28 at ¶ 38(a).

before taking him to Pinnacle Health Harrisburg Hospital to receive medical treatment for his injuries. *Id.* at ¶ 23.

Following his arrest, Billy asserts that Maurer and Lyda filed inconsistent and false reports. *Id.* at ¶ 26. Specifically, Billy claims that Maurer stated in his report that "[he] saw [Billy] lunge forward and slam himself on the hood." *Id.* at ¶ 27. Lyda, however, allegedly stated in his report that "[he] began to have Billy lean onto the left front fender of the []truck with his stomach on the fender. As [Billy] leaned onto the truck, [Billy] began to yell, stating that [Lyda] knocked his tooth out." *Id.* at ¶ 28. Moreover, according to Billy, Peiper's report stated that "[he (Peiper)] looked away towards the remaining suspects ... [s]hortly after [he] heard a bang and [Billy] yelled 'you broke my tooth.'" *Id.* at ¶ 29. Thereafter, Billy claims that Lyda approved Peiper's and Maurer's reports, while Karlsen approved Lyda's. *Id.* at ¶ 30, 32. As well, Billy alleges that Wetzel and Karlsen failed to initiate an internal affairs investigation. *Id.* at ¶ 33.

On June 20, 2012, Peiper filed a motion to dismiss Billy's amended complaint in which Billy concurred. *Doc.* 66. The Court granted the motion and Peiper was accordingly dismissed. *Doc.* 69.

### B. Defendants' Motion to Disqualify.

After Peiper filed his motion to dismiss, the defendants collectively filed a motion to disqualify Jacob and the Boyle Firm, together with a brief, and other

documents, in support of the same. *Docs.* 31, 32, & 32-1. Generally, the defendants argue that Jacob's past representation of Harrisburg and Lyda in *Horton v. City of Harrisburg*, 06-CV-02338 (CCC) precludes him from representing Billy in this matter. *Doc.* 32 at 1. According to the defendants, Jacob's representation of Billy constitutes a conflict of interest in violation of Rule 1.9(a) of the Pennsylvania Rules of Professional Conduct. *Id.* at 1-2. Jacob, however, maintains that there is no basis for disqualification in this matter. He argues that his role in the prior representation of Harrisburg and Lyda was minimal, did not involve the acquisition of attorney-client confidences, and that the *Horton* case is not substantially related to the instant lawsuit.[5]

On August 6, 2012, following court order (*see Doc.* 46), Billy filed a brief in opposition. *Doc.* 47. On August 20, 2012, the defendants filed a timely reply brief. *Doc.* 50. We conducted an evidentiary hearing on the motion, on May 30, 2013, at which time Lavery and Lyda testified on the defendants' behalf and were

---

[5]     In their brief, the defendants specifically refer to three other civil rights cases wherein they allege that Jacob represented Harrisburg. *See Doc.* 32 at 5-6. Jacob argues, however, that he only represented Harrisburg in one of those three cases, and that the single case involved a dispute over the issuance of a parking ticket. *Doc.* 47 at 5-6; *see Doc.* 52 at ¶¶ 15-16; *see also Doc.* 32-1 at 102-09. Furthermore, given that the defendants produced no evidence showing the extent of Jacob's involvement in those cases, we credit Jacob's argument.

cross-examined by Jacob.  The motion, having been fully argued and briefed, is

ripe for disposition on the merits.[6]

### C. Jacob's Prior Representation and the Alleged Conflict of Interest.

Jacob was previously employed by the law firm of Lavery, Faherty, Young

& Patterson, P.C. (the "Lavery Firm") "for many years."  *Doc.* 68 at 6.  On

December 30, 2011, Jacob left the Lavery Firm and sought other employment

opportunities.  *See Doc.* 32-1 at 26.  While working at the Lavery Firm, Jacob

entered appearances in approximately 13 lawsuits on behalf of Harrisburg and its

officials, *Doc.* 32-1 at 111-14, including the case of *Horton*, in which, as here,

Lyda and Harrisburg were defendants.

In *Horton*, the plaintiffs brought a civil rights action under 42 U.S.C. § 1983

as administrators of their son's estate.  *Doc.* 32-1 at 31, 36.  In that case, the

plaintiffs' son was allegedly shot and killed by Lyda during a traffic stop.  *Id.* at

32-36.  As a result, the plaintiffs raised a Fourth Amendment excessive force claim

against Lyda and municipal liability claims against Harrisburg.  *Id.* at 36-39; *Doc.*

68 at 16-17.  Among other things, the *Horton* plaintiffs asserted that Lyda had a

---

[6]     On February 11, 2013, Billy, through Jacob, filed an affidavit that gave the appearance of being a sur-reply to the defendants' motion to disqualify.  *Doc.* 52. The defendants moved to strike because Billy had not sought leave of court in accord with Local Rule 7.7 to file such a response.  *Doc.* 53.  Given that a hearing was to be held on this motion, the undersigned orally denied the defendants' motion to strike at the hearing, and considered the affidavit as a supplement to the evidence elicited at the hearing.

"troubled history as a rogue police officer," and Harrisburg "created an[d] fostered an environment that encourages behavior amongst its police officers that is consistent with [Lyda's behavior] described herein…." *Doc.* 32-1 at 35, 36.

Although not lead counsel in *Horton*, Jacob was responsible for filing the petition for removal, as the case was originally filed in state court. *Doc.* 68 at 17. Likewise, Jacob drafted the defendants' summary judgment brief and reply brief. *Doc.* 32-1 at 116-32; *Doc.* 52 at ¶ 18; *Doc.* 68 at 17. In preparation for drafting such briefs, Jacob reviewed a 40-page report prepared for the insurance carrier that contained case facts, background information, analysis, case strengths and weaknesses, client exposure information, and discussion of settlement value. *Doc.* 68 at 18, 23. As well, Jacob had access to, and likely reviewed, the Lavery Firm's case file which would have included items such as Lyda's personnel history, disciplinary history, complaints filed against him, and internal affairs investigation reports. *Id.* at 23, 40. Further, Jacob attended internal firm meetings on the matter and worked on at least one motion *in limine* in preparation for trial. *Id.* at 24.

Equally important, after the summary judgment motion was denied in *Horton*, Jacob, and the Lavery Firm's other attorneys working on the case, met with Lyda for 1.7 billable hours. *Id.* at 19-20, 29. Frank Lavery ("Lavery"), Jacob's former supervisor, testified that he assigned Jacob to attend the meeting with Lyda because Jacob was the most familiar with the file having worked on the

summary judgment briefs. *Id.* at 20, 21. Lavery also thought that Jacob's past experience as a police officer would allow him to best relate to Lyda. *Id.* Moreover, although Lavery could not recall specifics about the meeting other than the fact that it was arranged to primarily discuss the issues going forward to trial, he believed that Lyda's personnel history, disciplinary history, and training were likely discussed. *Id.* at 20-21, 30. Lavery also pointed out that a confidential internal affairs report was likely discussed at the meeting, such report dealing with another matter where Lyda was accused of using excessive force to shoot out a suspect's tires as the suspect was trying to run him down. *Id.* at 35. Last, at the meeting, Billy was afforded an opportunity to observe Lyda "unguarded", to hear Lyda's personal views on the case and his role as a police officer, and to assess his credibility and demeanor as a witness. *See id.* at 31-32, 36, 38. In total, Jacob billed approximately 100 hours working on the *Horton* matter. *Id.* at 19.

## III. <u>Discussion</u>.

### A. **Legal Standard – Motion to Disqualify.**

"Federal courts have inherent authority to supervise the conduct of attorneys appearing before them." *AgSaver LLC v. FMC Corp.*, No. 11–CV–997, 2011 WL 2274178, at *3 (E.D.Pa. June 9, 2011). To guide such supervision, the Court has adopted the Pennsylvania Rules of Professional Conduct. *See* M.D.Pa.L.R. 83.23.2. Violation of the Pennsylvania Rules of Professional Conduct, however,

does not result in mandatory disqualification. *See, e.g., AgSaver LLC v. FMC Corp.*, No. 11–CV–997, 2011 WL 2274178, at *3 (E.D.Pa. June 9, 2011). "Rather, to disqualify opposing counsel, the moving party must clearly show that continued representation would be impermissible." *Id*. (citation and internal quotation marks omitted). Indeed, "[d]isqualification is a harsh measure and is generally disfavored by the court." *Id*.; *see also Bell v. Lackawanna Cnty.*, No. 08–CV–1926, 2011 WL 2356851, at *1 n. 6 (M.D.Pa. June 7, 2011).

"Nonetheless, doubts regarding the existence of an ethical rule violation should be construed in favor of disqualification," *AgSaver LLC v. FMC Corp.*, No. 11–CV–997, 2011 WL 2274178, at *3 (E.D.Pa. June 9, 2011) (quoting *James v. Teleflex, Inc.*, 1999 WL 98559, at *3 (E.D.Pa. Feb. 24, 1999)), and "a court may disqualify an attorney ... when disqualification is an appropriate means of enforcing the applicable disciplinary rule, keeping in mind any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Mumma v. Bobali Corp.*, 382 F. App'x 209, 210 (3d Cir. 2010) (citation and internal brackets and quotation marks omitted).

### B. Rule 1.9(a) of the Pennsylvania Rules of Professional Conduct.

The defendants argue that under Pennsylvania Rule of Professional Conduct 1.9(a) Jacob cannot represent Billy in this matter because he represented

Harrisburg and Lyda on substantially related matters, without the consent of either defendant. *See Doc.* 32 at 7-8.

Pennsylvania Rule of Professional Conduct 1.9(a) provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

Pa. Rule of Prof'l Conduct, Rule 1.9 (a). "Disqualification under Rule 1.9(a) is required if (1) the former representation is the same or substantially related to the present matter, (2) the interests of counsel's current client are materially adverse to the interests of the former client, and (3) the former client has not consented." *Jordan v. Phila. Housing Auth.*, 337 F.Supp.2d 666, 672 (E.D.Pa. 2005). As noted, the moving party "must clearly show that continued representation would be impermissible." *AgSaver LLC v. FMC Corp.*, No. 11–cv–997, 2011 WL 2274178, at *3 (E.D.Pa. June 9, 2011). "Vague and unsupported allegations are insufficient to meet this burden." *Cipressi v. Bristol Borough*, No. 10–CV–1584, 2012 WL 606687, at *2 (E.D.Pa. Feb.27, 2012).

Here, the second and third requirements of Rule 1.9(a) are satisfied. Lyda and Harrisburg are former clients of Jacob that are being sued by Jacob's present

client, Billy.[7] "There is no situation more 'materially adverse' than when a lawyer's former client is in a suit against that lawyer's current client." *Jordan v. Philadelphia Hous. Auth.*, 337 F. Supp. 2d 666, 672-73 (2004) (citing *Int'l Longshoremen's Ass'n., Local Union 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287, 291-92 (E.D. Pa. 1995)). Moreover, the record reflects that none of the defendants have consented to Jacob's representation of Billy in this matter.

Accordingly, we focus our analysis on whether the first requirement of Rule 1.9(a) is met: whether Jacob's representation of Billy in the present matter is the same or substantially related to the *Horton* matter.

### C. Substantial Relationship Analysis.

In determining whether a substantial relationship exists between the prior representation and the present matter under Rule 1.9(a), it is not enough that the two representations involve similar or related facts. *See INA Underwriters Ins. Co. v. Nalibotsky*, 594 F. Supp. 1199, 1206 n. 5 (E.D.Pa. 1984); *see also AgSaver LLC v. FMC Corp.*, No. 11–cv–997, 2011 WL 2274178, at *4 (E.D.Pa. June 9, 2011). Rather, the substantial relationship test is met "when an attorney *might* have acquired confidential information as counsel in one matter which is also relevant to the other matter." *ILA Local Union 1332 v. ILA*, 909 F. Supp. 287, 291 (E.D.Pa. 1995) (citing *Akerly v. Red Barn System Inc.,* 551 F.2d 539, 544 n.12 (3d Cir.

---

[7] Jacob does not contest that Lyda or Harrisburg were his former clients; instead, he simply contends that no substantial relationship exists.

1977)(emphasis added). If, "in the course of the prior representation, the client *might* have disclosed to its attorney confidences which could be relevant or possibly detrimental to the former client in the present action," the two matters are substantially related and an irrebuttable presumption arises that compels attorney disqualification. *Henry v. Delaware River Joint Toll Bridge Comm'n*, No. CIV. A. 00-6415, 2001 WL 1003224, at *2 (E.D.Pa. Aug. 24, 2001)(emphasis added); *see also Dworkin v. General Motors Corp.*, 906 F. Supp. 273, 279 n.7 (E.D.Pa. 1995); *Reading Anthracite Co. v. Lehigh Coal & Navigation Co.*, 771 F. Supp. 113, 117 (E.D.Pa. 1991).

An irrebutable presumption arises because one of the highest duties of an attorney is to maintain a client's confidences that are disclosed in the context of the attorney-client relationship. Rule 1.6 of the Pennsylvania Rules of Professional Conduct outlines the scope of what constitutes confidential information, and it applies not merely to matters communicated in confidence by a client, but also to any information relating to the representation, whatever the source. *See* Pa. Rule of Prof'l. Conduct, Rule 1.6 ("A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation...."); *Dworkin*, 906 F.Supp. at 277 (E.D.Pa. 1995).

Our courts within the Third Circuit have structured the analysis of whether two matters are substantially related by answering the following three questions:

1. What is the nature and scope of the prior representation at issue?

2. What is the nature of the present lawsuit against the former client?

3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

*Kaleta v. Clausi*, Civil No. 4:12-CV-1987, 2013 WL 1804203 at * 7 (M.D. Pa. April 29, 2013) (internal citations omitted).

"In answering the first question the court should focus upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform. With respect to the second question, the court should evaluate the issues raised in the present litigation and the underlying facts. Finally, in answering the third question, the court should be guided by the interpretation of the word 'might'...." *AgSaver LLC v. FMC Corp.*, No. 11–cv–997, 2011 WL 2274178, at *4 (E.D.Pa. June 9, 2011). "Courts have defined the word 'might' to mean either when '(a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship.'" *Id*.

**1. The Nature and Scope of the Prior Representation.**

With regard to the nature of Jacob's prior representation and the tasks he performed, the record establishes that Jacob was directly involved in the representation of Harrisburg and Lyda in the *Horton* matter. Though factually different from Billy's case, the underlying claims in *Horton*, relating to Lyda and Harrisburg, are the same as those raised in Billy's amended complaint. As well, although not the lead attorney in the case, the record shows that due to his writing ability, Jacob was the main legal draftsman. *See Doc.* 68 at 18. In particular, he prepared the removal petition, at least one motion *in limine*, and drafted both the brief in support and reply brief on the motion for summary judgment. In this aspect of his representation, he necessarily conducted legal research and analyzed the claims asserted in addition to the facts discovered.

The record further shows that Jacob was exposed to case strategy information in *Horton*, including a detailed report prepared for the insurance carrier. *Supra* at 8. Moreover, Jacob does not deny having access to privileged information (*see Doc.* 52 at ¶ 27), and his personal attendance at a trial preparation meeting with Lyda actually placed him in a position to hear and observe Lyda discussing issues such as his role as a police officer and his personal views about the case.

## 2. The Nature of the Present Lawsuit.

Turning to the nature of the present matter, the docket reflects that Billy was initially represented by other attorneys at the Boyle Firm. *See Doc.* 1. In the original complaint, filed on August 23, 2011, Billy only raised a Fourth Amendment excessive force claim against Peiper. *Id.* On December 30, 2011, however, Jacob left the Lavery Firm, and, on January 18, 2012, he entered an appearance, from the Boyle Firm, on Billy's behalf. Thereafter, Jacob drafted and filed a comprehensive amended complaint for Billy. The amended complaint includes new defendants, new claims, and detailed allegations of what Jacob *expects* to be produced during discovery. *Supra* at 3.

## 3. Lyda and Harrisburg Might Have Disclosed Confidences to Jacob.

Having discussed Jacob's past and present representations, the Court must now determine whether Harrisburg, Lyda, or both, *might* have disclosed confidences to Jacob that could be relevant to the present matter, and specifically whether any such confidences could be detrimental to the defendants in this action. Accordingly, based on the arguments presented in the briefs and the witnesses' testimony, we find that Jacob might have received confidential information in several forms.[8]

---

[8] Although at the hearing, defendants presented somewhat equivocal evidence regarding the documents Jacob reviewed and the specifics of the internal firm meetings and pre-trial meeting with Lyda, we believe the record establishes that

In preparing the briefs in support of Harrisburg's and Lyda's motion for summary judgment in *Horton*, Jacob had access to, and reviewed, the Lavery Firm's file on the case which, at minimum, included Lyda's personnel history, disciplinary history, complaints filed against him, and internal affairs investigation reports.  Jacob further had access to at least one report that the Lavery Firm sent to the insurance carrier setting forth confidential information within the meaning of Pa. Rule of Prof'l Conduct, Rule 1.6.  But, even more damaging is Jacob's involvement at a pre-trial meeting with Lyda where the record reflects that Jacob *might* have obtained confidences directly from Lyda by observing his credibility, his personal beliefs about his job, and his potential as a witness in a case.  Furthermore, while Lavery himself could not recall the specifics of that meeting, there is no question about Jacob's participation given Lavery's testimony that he brought in Jacob for two reasons: (1) Jacob had the best familiarity with the case file having briefed the summary judgment motion; and (2) Jacob could best relate to Lyda because of Jacob's past experience as a police officer.  Thus, given that Billy has raised the same claim against Lyda, such information that Jacob might have obtained from Lyda, in *Horton*, would be detrimental to him in the instant matter.

---

Jacob actually obtained client confidences from Lyda and Harrisburg during the course of his representation of them in the *Horton* matter.  Nevertheless, given the scope of his participation in the *Horton* case and his access to the case file, the standard set forth in Pa. Rule of Prof'l Conduct, Rule 1.9(a) is undoubtedly met.

Further, Jacob's access to the *Horton* file in connection with his prior representation is directly relevant to Billy's *Monell* claim in this case and detrimental to Harrisburg. *See Monell*, 436 U.S. at 694-95 (holding that a municipality can be found liable under §1983 "only when the execution of the government's policy or custom ... inflicts the injury...." (internal quotations omitted)); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under §1983."). Jacob argues that the language contained in the amended complaint, with regard to the *Monell* claims, is "boilerplate" that would be contained in any other *Monell* complaint (*Doc.* 68 at 60), and that such language merely asserts what Billy believes discovery will reveal. The specific allegations contained in the amended complaint, however, exceed the information that is generally known to the public. Particularly, Billy's amended pleading makes it clear that Jacob intends to rely upon and consider confidences that he obtained or might have obtained in his prior representation in *Horton,* such as: patterns of misconduct through prior incidents; supervisory knowledge of prior unlawful conduct; improper conduct that was tolerated or ignored and that remedial action was avoided; past failures to investigate complaints or discipline employees; and past failures to keep and

maintain proper records and have proper procedures in place for the investigation of complaints.  Furthermore, having access to otherwise confidential information from a previous representation could provide Jacob advantages such as "knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what line of attack to abandon and what line to pursue, what settlements to accept and what offers to reject, and innumerable other uses." *Webb v. E.I. DuPont de Nemours & Co., Inc.*, 811 F.Supp. 158, 162 (Del. 1992) ("It is immaterial that those documents would be available to any attorney in discovery. Rule 1.9(a) [which governs duties to former clients] is not addressed to the documents but to the representation in general.").  It is, therefore, unfair to afford one side such an advantage.  *H2O Plus, LLC v. Arch Personal Care Products, L.P.*, CIV A No. 10-3089,  2010 WL 4869096, at *12 (D.N.J. Nov. 23, 2010).

Jacob's conflicts with respect to Lyda and the City of Harrisburg, in turn, create a cascading series of legal and ethical dilemmas both for Jacob and for the other defendants in the current litigation.  If Jacob is in a position potentially to use prior client confidences against Lyda and Harrisburg, the advantage he derives from any active use of this prior representation harms not only Lyda and Harrisburg.   It also adversely affects the interests of those defendants who are joined with Lyda and Harrisburg in this case by undermining any joint defenses. Conversely, if Jacob is compelled by ethical considerations to refrain from

pursuing certain lines of inquiry and litigation with respect to Lyda, then these ethical constraints may compel Jacob to adopt a more aggressive approach to litigation of claims against the remaining defendants, as to whom Jacob is not ethically hobbled. In either event, the distorting effect of the current ethical dilemma extends beyond Jacob, Lyda and Harrisburg to all parties in this litigation.

Finally, Jacob appears to exhibit an incorrect perception of the legal standard on this type of motion by suggesting that the matter should be resolved based on his assertion that he will not disclose any confidences that he might have obtained, and that the Federal Rules of Evidence actually prevent him from so doing. Rule 1.9, however, is not designed merely to prevent the disclosure of confidences by the lawyer. Rather, as the United States Court in the Southern District of New York concisely stated in construing New York's counterpart to Pennsylvania's Rule of Professional Conduct 1.9:

> [The Rule] concerns itself as much with the lawyer's use of confidential information in a manner adverse to the interests of the former client that trusted the lawyer with its confidences. *Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses.*

*Ullrich v. Hearst Corp.*, 809 F.Supp. 229, 235-36 (S.D.N.Y. 1992)(emphasis added). For these reasons, we find that Jacob's prior representation of Lyda and

Harrisburg, in *Horton*, is substantially related to the matters involved in Billy's case. Jacob, therefore, should not be permitted to continue to represent Billy in this matter.

### D. Jacob's Conflicts of Interest are Imputed to the Boyle Firm.

Jacob's ethical conflicts are imputed to the Boyle Firm, compelling the firm's disqualification in this case. In general, confidential information gained by one member of a law firm is imputable to other members of the same law firm. *Estate of Pew*, 655 A.2d 521, 545 (Pa. Super. Ct. 1994) (citing *Maritrans v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277 (Pa. 1992)). Moreover, Rule 1.10 of the Pennsylvania Rules of Professional Conduct provides, in pertinent part:

> (b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the … substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter unless:
>
> > (1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and
> >
> > (2) written notice is promptly given to the appropriate client to enable it to ascertain compliance with this rule.

Pa. Rule of Prof'l Conduct, Rule 1.10(b). Thus, a former client seeking to disqualify a law firm representing an adverse party on the basis of its past relationship with a member of the law firm has the burden of proving: (1) that a

past attorney-client relationship existed, which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that a member of the law firm, as attorney for the adverse party, acquired knowledge of confidential information from or concerning the former client, actually or by operation of law. *Estate of Pew*, 655 A.2d at 545-46 (internal citations omitted).

Here, there is no evidence suggesting that the Boyle Firm took efforts to screen Jacob from Billy's case.[9] On the contrary, Jacob has been thoroughly involved with this matter since entering an appearance and filing the amended complaint. Moreover, based on the facts contained herein, coupled with our findings, *supra*, that Jacob might have obtained confidences from Lyda and Harrisburg, we find that the Boyle Firm should be equally disqualified from representing Billy.

**E. Conclusion.**

In light of the governing legal standards with regards to motions seeking to disqualify counsel, and given the facts involved herein, we find that Jacob might have obtained confidences during his prior representation of Lyda and Harrisburg that could be relevant and detrimental to them in the present matter. In reaching

---

[9] *See Dworkin*, 906 F.Supp. at 279 ("In a Rule 1.10(b) inquiry, the burden of proof [with regard to screening] is on the firm whose disqualification is being sought.").

this decision, we are mindful of the important policy considerations involved in attorney disqualification matters including permitting Billy to retain the counsel of his choice and enabling Jacob to practice without excessive restrictions. But, to permit Jacob to continue to represent Billy in this action would conflict with the purposes behind Rule 1.9, which are to prevent even the potential that a former client's confidences may be used against him or her, to maintain public confidence in the integrity of the bar, and to fulfill a client's rightful expectation of the loyalty of his attorney in the matter for which he is attained. *In re Corn Derivatives*, 748 F.2d 157, 162 (3d Cir. 1984). Consequently, Jacob and the Boyle Firm should be disqualified.

## IV.    Recommendation.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that:

(1) The defendants' motion to disqualify counsel (*Doc.* 31), be **GRANTED**; and

(2) Jacob and his law firm be immediately separated from this action.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to

which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **18th** day of **July, 2013**.


*S/ Susan E. Schwab*
**Susan E. Schwab**
**United States Magistrate Judge**